# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                     )
CHARLES L. FONVILLE,      )
                     )
        Plaintiff,    )
                     )  Case No. 1:02-CV-02353 (EGS)
      v.           )
                     )
DISTRICT OF COLUMBIA     )
                     )
        Defendant.    )
_____)


## MEMORANDUM OPINION

Plaintiff Charles Fonville brings this action against the District of Columbia ("District") pursuant to the Fifth Amendment of the Constitution and 42 U.S.C. § 1983. Plaintiff alleges that he was deprived of his constitutionally protected property interests when he was demoted from the rank of Commander to Captain in the Metropolitan Police Department ("MPD") without notice or a hearing. He also claims that certain statements made by the MPD in connection with his demotion damaged his professional reputation, depriving him of a liberty interest. Pending before the Court are Defendant's renewed motion for summary judgment, Plaintiff's renewed cross motion for partial summary judgment, and Plaintiff's petition for attorney fees based on the Court's previous award of sanctions against the District for discovery violations.

This case has a long history for a number of reasons, including discovery abuses by the District.  Most recently, however, the case was stayed to await the outcome of two cases pending before the District of Columbia Court of Appeals.  These cases squarely addressed a central issue in this case: whether a Commander in the MPD has a property interest in his position, or whether he may be demoted to the rank of Captain at the pleasure of the Chief of Police.  *See Hoey v. D.C. Office of Employee Appeals and D.C. Metropolitan Police Department*, No. 10-CV-963, and *Burton v. D.C. Office of Employee Appeals*, No. 09-CV-1493.  Recognizing the high degree of deference this Court gives to the District of Columbia Court of Appeals to determine matters of local law, *see, e.g.*, *Pernell v. Southall Realty*, 416 U.S. 363, 368 (1974), the Court stayed the proceedings in this case until the appeals were finally exhausted in 2012.

The Court of Appeals found that Commanders and other MPD officers above the rank of Captain do not have a property interest in their positions, and may therefore be demoted to Captain without cause, notice, or an opportunity to be heard.  For the reasons set forth below, that decision compels the same outcome in this case.  Thus Defendant's renewed motion for summary judgment as to Plaintiff's property interest claim will be **GRANTED** and Plaintiff's renewed cross motion will be **DENIED**.  Upon consideration of defendant's renewed motion for summary

judgment on Plaintiff's liberty interest claim, Plaintiff's response, the relevant caselaw and the entire record in this case, the motion for summary judgment will be **GRANTED.** Finally, upon consideration of the motion for attorney fees, the Court awards Plaintiff fees in the amount of $53,480.04 as sanctions for the Defendant's failure to comply with the Court's discovery orders.

**I. BACKGROUND**

Plaintiff Charles Fonville joined the MPD in February 1972. Compl. ¶ 6. He was promoted to Captain in 1995. *Id.* On March 7, 1999, then Police Chief Charles Ramsey promoted Plaintiff directly from Captain to Commander, skipping over the rank of Inspector. Pl.'s Renewed Combined Opp'n to Def.'s Summ. J. Mot. and Cross Mot. for Partial Summ. J. (hereinafter "Pl.'s Opp'n/Cross Mot.") Ex. 6, Deposition of Charles Fonville ("Fonville Dep.") at 60-61 (ECF No. 122). Plaintiff received a two-grade pay increase to correspond with his two level promotion in rank. *Id.; see also* Exs. 18, 21.

Approximately seven months after his promotion, on October 22, 1999, Mr. Fonville was involved in an incident with officers of the Federal Protective Service ("FPS") regarding his illegally parked car. Compl. ¶¶ 8-9. Plaintiff, who was off duty at the time, was arrested for assaulting a police officer. *Id.* ¶¶ 8, 12-15. He was released without charges. *Id.* ¶¶ 15-

16.  The MPD Office of Internal Affairs ("IAD") began an investigation of the incident on October 25, 1999.  As part of the investigation, Plaintiff gave a transcribed oral statement regarding the incident.  The IAD obtained recorded statements from several other witnesses as well.  *Id.* ¶ 17.  The IAD filed a report of its investigation on November 10, 1999.  Pl.'s Opp'n/Cross Mot. Ex. 8.  IAD found there was insufficient evidence to sustain charges of "assault" and "conduct unbecoming of an MPD officer," against Plaintiff, but found that he violated District of Columbia Municipal Regulations for failing to have his service weapon and badge in his possession while in the District of Columbia.  *Id.*  The IAD recommended that Plaintiff be "referred to his commanding officer for administrative action."  *Id.*

On or about November 29, 1999, Chief Ramsey summoned Mr. Fonville to his office.  Chief Ramsey said he had reviewed the file regarding the October 22 incident, and felt that Mr. Fonville's actions were inappropriate.  Fonville Dep. 93.  Chief Ramsey then told Plaintiff he was being demoted to the rank of Captain.  Compl. ¶ 19.  On his way out of the meeting, Mr. Fonville was given a white envelope containing a Captain's badge, cap plate and rank insignia.  *Id.*  His demotion was effective as of December 5, 1999.  Pl.'s Opp'n/Cross Mot. Ex.

18.  Plaintiff worked as a Captain in the MPD until he retired from MPD in March, 2000.  Compl. ¶¶ 19-21.

The incident regarding Plaintiff's encounter with the FPS, and his subsequent demotion, was reported in *The Washington Post* and *The Washington Times* on November 30, 1999.  Pl.'s Opp'n/Cross Mot. Ex. 11.  The articles attributed comments to Chief Ramsey that Plaintiff had been demoted because he engaged in "unacceptable behavior" in connection with the incident, which "was not consistent with what I expect from a command member of my staff." *Id.*  Chief Ramsey does not deny making these statements to the press. *Id.* at Ex. 5, Dep. of Charles Ramsey ("Ramsey Dep.") at 168-74.

Plaintiff filed suit in this Court in November 2002.  Count One of his Complaint alleges that the District deprived him of his property interest in the Commander position, in violation of the Fifth Amendment of the Constitution and 42 U.S.C. § 1983, by demoting him without due process of law.  Count Two alleges that the District deprived him of his liberty interest in pursuing his chosen profession by defaming him in the course of demoting him from Commander to Captain, also in violation of the Fifth Amendment and section 1983.  The parties engaged in discovery until December 2005, when the District moved for summary judgment.  Def.'s First Mot. for Summ. J. (ECF No. 41).  On August 22, 2006, the Court denied the motion for summary

judgment. The Court further found that Plaintiff had a property interest in his Commander position and, thus, could not be demoted without due process. *Fonville v. Dist. of Columbia*, 448 F. Supp. 2d 21, 23 (D.D.C. 2006). A jury trial was scheduled for February 2008; however, in January 2008, over two years after the close of discovery, the District produced supplemental discovery and argued that it should be permitted to file a new motion for summary judgment based in part on the newly-disclosed evidence. Def.'s Proposal for Proceeding (ECF No. 77). During the same time period, the District brought to the Court's attention authority from other district judges and argued for the first time that Plaintiff failed to exhaust his administrative remedies. *See, e.g.*, Def.'s Notices of Suppl. Auth. (ECF Nos. 89, 90) (citing *Washington v. District of Columbia*, 538 F. Supp. 2d 269 (D.D.C. 2008); *Hoey v. District of Columbia*, 540 F. Supp. 2d 218 (D.D.C. 2008)). Plaintiff, for his part, moved for sanctions based on discovery abuses by the District. Pl.'s Mot. for Sanctions (ECF. No. 82).

In April 2008, the Court denied Defendant's motion to file a new summary judgment motion based on the newly-discovered evidence, granted in part Plaintiff's motion for discovery sanctions, and ordered the parties to brief two issues: the appropriate amount of attorneys' fees to be awarded Plaintiff in view of his successful motion for sanctions, and the exhaustion

issue.[1]  Minute Order, Apr. 7, 2008.  The supplemental briefing

on the exhaustion issue was informed in part by submissions of

supplemental authority regarding other cases, similar to this

one, in which MPD Commanders challenged their demotions to

Captains without due process of law in the District's

administrative agencies and state courts.  *See, e.g.,* Def.'s

Notices of Suppl. Auth. (ECF Nos. 112, 114).  In May 2009, the

Court denied defendant's motion for summary judgment on

exhaustion grounds without prejudice and, based on the parties'

representations that they wished to file yet more dispositive

motions, set a briefing schedule for renewed cross motions for

summary judgment.  Minute Order May 14, 2009.  Meanwhile, the

parties continued to file notices of supplemental authority as

other cases filed by other demoted Commanders proceeded through

the District's judicial system.  *See, e.g.,* Parties' Notices of

Suppl. Auth. (ECF Nos. 136, 137, 138, 139).

　　　In 2010, the District moved for a stay of proceedings until

two of these other cases, *Hoey* and *Burton*, were finally resolved

by the District of Columbia Court of Appeals.  The District

acknowledged that the governing statute had changed between Mr.

---

[1]  The parties fully briefed Plaintiff's motion for
attorney's fees, and the Court granted the motion, but deferred
a determination on the amount of fees.  The fees issue is
addressed at Section III.C, *infra*.

Fonville's demotion in 1999 and Mr. Hoey and Mr. Burton's demotions in 2007 and 2008. However, the District argued that the changes were irrelevant to the question before the Court: in all relevant respects, the District argued, the statutory provisions were identical. Def.'s Reply in Support of Mot. to Stay at 2-5 (ECF No. 144). Therefore, the District argued the District of Columbia Court of Appeals decisions would be "critical to the proper disposition of this case." *Id.* at 7. This Court agreed that the case should be stayed, finding "striking similarities between the governing law in this case and in *Hoey* and *Burton*," and in view of the high degree of deference the District of Columbia Court of Appeals is entitled to from the federal courts in determining matters of local law. Mem. Order Staying Case, Feb. 28, 2011 (ECF No. 147).

The District of Columbia Court of Appeals issued a single decision resolving the *Hoey* and *Burton* cases on November 3, 2011. After analyzing the relevant provisions of the D.C. Code, the legislative history, and the regulations, the Court of Appeals found that Mr. Hoey and Mr. Burton had no property interest in their Commander positions, and even though they were Career Service employees, could be demoted to Captain without cause and without notice or a hearing. *Burton v. Office of Employee Appeals, et al.*, and *Hoey v. Office of Employee Appeals, et al.*, 30 A.3d 789 (D.C. 2011) (hereinafter "*Burton*").

The appeals became final in February 2012, and in late 2012, the Court granted the parties leave to file supplemental memoranda in support of their motions for summary judgment. The motions are now ripe for decision by the Court.

## II.  STANDARD OF REVIEW

### A. Summary Judgment

Summary judgment is appropriate when the moving party demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009). To establish a genuine issue of material fact, the nonmoving party must demonstrate—through affidavits or other competent evidence, Fed. R. Civ. P. 56(c)(1),—that the quantum of evidence "is such that a reasonable jury could return a verdict for the nonmoving party." *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson*, 477 U.S. at 248). In ruling on a motion for summary judgment, the Court views all facts in the light most favorable to the nonmoving party. *Keyes v. District of Columbia*, 372 F.3d 434, 436 (D.C. Cir. 2004). A nonmoving party, however, must nevertheless provide more than "a scintilla of evidence" in support of its position, and conclusory, speculative, or "not

significantly probative" evidence is insufficient to survive summary judgment. *See Anderson*, 477 U.S. at 249.

### B. Motion for Reconsideration

"[T]here is no Federal Rule of Civil Procedure that expressly addresses motions for reconsideration." *Clark v. Feder, Semo & Bard, P.C.*, 736 F. Supp. 2d 222, 224 (D.D.C. 2007). Because the Court's Order of August 22, 2006 denying the District's motion for summary judgment is interlocutory, however, the District's renewed motion for summary judgment can properly be characterized as a motion for reconsideration under Rule 54. *See Musick v. Salazar*, 839 F. Supp. 2d 86, 93 (D.D.C. 2012); *see also* Fed. R. Civ. P. 54(b) ("[A]ny order or other decision . . . that adjudicates fewer than all the claims . . . may be revised at any time before the entry of a judgment adjudicating all the claims[.]"). "The Court has broad discretion to hear a motion for reconsideration brought under Rule 54(b), . . . and reconsideration is appropriate as justice requires[.]" *Clark*, 736 F. Supp. 2d at 225 (quotations and citations omitted).

### III. DISCUSSION

#### A. The *Burton* Decision Is Controlling As to Count One of the Complaint; Accordingly, Mr. Fonville Has No Property Interest in His Commander Position

The District argues that the *Burton* decision changed the controlling law since the Court denied its motion for summary

judgment on Count One of the Complaint in 2006, and therefore justice requires that the Court reconsider that decision. Def.'s Suppl. Mem. in Support of Summ. J. (ECF No. 155). The Court agrees, and therefore grants the District's motion for reconsideration.

In *Burton*, the Court of Appeals traced the history of the statutory provisions providing the District's Commissioner (later called Mayor) or the Chief of Police,[2] with the authority to unilaterally return certain high-ranking police officers to the rank of Captain. *Burton*, 30 A.3d at 792-94. In the 1970s, D.C. Code § 4-103 provided, in relevant part:

> [T]hat the assistant superintendents and inspectors shall be selected from among the captains of the force and shall be returned to the rank of captain when the Commissioner so determines.

D.C. Code § 4-103 (1973). Likewise, D.C. Code § 4-104, which was in effect when Plaintiff was demoted, provided in pertinent part:

> [T]hat the Assistant and Deputy Chiefs of Police and Inspectors shall be selected from among the captains of the force and shall be returned to the rank of captain when the Mayor so determines.[3]

---

[2] In an order issued on May 9, 1997, the Mayor delegated his personnel authority under these provisions to the Chief of Police. *Burton*, 30 A.3d at 792 n.5 (citing Mayor's Order 97-88, 44 D.C. Reg. 2959-60 (May 16, 1997)).

[3] This section was recodified in 2001 as § 5-105. *Burton*, 30 A.3d at 793, n.8. Likewise, § 1-633.3(1)(B), discussed *infra*, was recodified in 2001 as § 1-632.03(a)(1)(B). For the purposes of

D.C. Code § 4-104 (1981).

As the *Burton* court observed, these provisions must be read
in tandem with the Comprehensive Merit Personnel Act ("CMPA"),
which was enacted in 1978 and provides many Career Service
employees with job related protections, including protection
from demotion without due process. *Burton*, 30 A.3d at 791-92;
*see also* D.C. Code § 1-616.52(b). When the CMPA was enacted, it
curtailed the authority of the Mayor and the Chief of Police to
return high ranking officials to Captain at will "*with respect
to officers hired after the CMPA went into effect." Burton*, 30
A.3d at 793 (emphasis added) (citing D.C. Code § 1-633.3(1)(B)
(1981), enacted as part of the CMPA, which provided that § 4-103
and § 4-104 "shall not apply to police officers . . . appointed
after the date that this chapter becomes effective"). The Court
of Appeals emphasized this distinction between police officers
hired prior to the enactment of the CMPA and those hired
subsequent to its enactment by repeating the point as follows:
"For the next twenty years [after the CMPA was enacted], no
statute authorized the Mayor or the Chief of Police to return
police officials above Captain (*and hired after the CMPA went
into effect*) to the rank of Captain without cause." *Burton*, 30
A.3d at 793 (emphasis added). "D.C. Code § 4-104 (1981), []

---

this decision, the relevant Code sections are the section
numbers in effect when Plaintiff was demoted in 1999.

pursuant to § 1-633.3(1)(B), *did not apply to officers hired after the CMPA's effective date." Id.* (emphasis added).  Of critical importance in this case, Mr. Fonville was hired on February 14, 1972, several years before the CMPA was enacted. Section 4-103, later § 4-104, was therefore not repealed by the CMPA as to him.

The *Burton* court also held, as a matter of law, that the language of § 4-104[4] applies to the position of Commander, 30 A.3d at 797, notwithstanding the fact that "Commander" does not appear in the statute's list of positions (Assistant Chiefs, Deputy Chiefs, and Inspectors) whose occupants may be summarily returned to the rank of Captain.  *See* D.C. Code § 4-104 (1981). The Court of Appeals explained:

> The titles listed have changed over the years as positions
> were renamed and new ranks were added, but the provision
> appears to have consistently covered those positions above
> the rank of Captain. . . .  It is uncontested that
> Assistant Chiefs outrank Commanders, who, in turn, outrank
> Inspectors.  It would have been illogical for the [D.C.]
> Council to provide the Mayor or his delegee with the
> authority to return Assistant Chiefs and Inspectors, the
> ranks immediately above and below Commanders, to the rank
> of Captain, but not to grant that same authority with
> respect to Commanders.  The better interpretation is that
> [the successor, and identical, provision to § 4-104]
> applies alike to Inspectors, Commanders, and Assistant
> Chiefs of Police.

---

[4] The Court of Appeals interpreted the successor provisions to § 4-104, which the Court noted were "identical" to that provision in all relevant respects, and further noted that the substance of the provision had "historical roots going back to 1919."   30 A.3d at 797.

*Burton*, 30 A.3d at 797-98 (internal citations omitted).

Mr. Fonville argues that *Burton* does not apply to his case for three principal reasons: first, because it interpreted the successor provisions to § 4-104, not § 4-104; second, because the decision is "fatally flawed;" and third, because Mr. Fonville's Commander position was different than Mr. Burton and Mr. Hoey's Commander positions, and the factual differences compel a different outcome in this case. *See* Pl.'s Suppl. Brief (ECF. No. 156). Unfortunately for Mr. Fonville, he cannot avoid the dispositive impact of *Burton*.

Plaintiff first argues that *Burton* does not apply to him because Mr. Burton and Mr. Hoey were demoted pursuant to D.C. Code § 1-608.01(d-1), a successor statute to § 4-104. This argument is without merit. As discussed *supra* at note 4, the statutes are identical in all relevant respects. Moreover, the *Burton* court specifically addressed the relationship between § 4-104 and the CMPA, and found the CMPA's protections do not apply to officers hired before its effective date with respect to § 4-104. Applying *Burton* to the facts of this case compels the conclusion that when Mr. Fonville was demoted in 1999, he was not protected under the CMPA because he had been hired as a police officer before it was enacted. See *Burton*, 30 A.3d at 793-94.

Mr. Fonville's claim that *Burton* was wrongly decided, and therefore should not be followed by this Court, Pl.'s Suppl. Brief at 5-8, is also not persuasive. Federal courts owe particular deference to interpretations of state law announced by the highest court of a state. "A State's highest court is unquestionably the ultimate exposito[r] of state law." *Riley v. Kennedy*, 553 U.S. 406, 425 (2008) (citation and internal quotation marks omitted); *see also Minn. v. Clover Leaf Creamery Co.*, 449 U.S. 456, 485 n.9 (1981) (Stevens, J. dissenting) ("This Court will defer to the interpretation of state law announced by the highest court of a State even where a more reasonable interpretation is apparent, a contrary conclusion might save a state statute from constitutional invalidity, or it appears that the state court has attributed an unusually inflexible command to its legislature.") (citations omitted). Nothing in Plaintiff's submissions provides a basis for the Court to depart from this bedrock principle of federalism.

Plaintiff's third argument – that his Commander position was different than Burton's and Hoey's Commander positions, and the factual differences permit this Court's 2006 decision to survive *Burton* – is also unpersuasive. This Court's 2006 decision was a very narrow one: the old Deputy Chief position listed in the text of § 4-104 was not "equivalent" to Mr. Fonville's specific Commander position, and therefore § 4-104

could not be read to encompass him. *Fonville*, 448 F. Supp. 2d
at 27-28. The *Burton* decision is much broader. The Court of
Appeals examined the legislative history and policy
determinations underlying § 4-104, its predecessors and its
successors. *See Burton*, 30 A.3d at 791-94, 797-98. The *Burton*
court acknowledged that neither § 4-104, nor its predecessors or
successors included Commanders in the list of positions from
which officers could be demoted at will. The court did not find
that fact dispositive, however. "The literal words of a
statute, however, are not the sole index to legislative intent,
but rather, are to be read in the light of the statute taken as
a whole, and are to be given a sensible construction and one
that would not work an obvious injustice. . . . The statutory
meaning of a term must be derived from a consideration of the
entire enactment against the backdrop of its policies and
objectives." *Id.* at 792 (internal quotation marks and citations
omitted). After careful review, the Court of Appeals determined
that application of the statute did not hinge on whether
specific duties associated with particular titles or ranks
remained constant over time. Rather, the Court of Appeals
concluded that although "the titles [] changed over the years .
. . and new ranks were added," § 4-104, its predecessors and its
successors "consistently covered those positions above the rank
of Captain." *Id.* at 797. The *Burton* court's decision therefore

clearly extends to Mr. Fonville's former position as Commander, and controls the outcome in this case.

*Burton* conclusively establishes that, as a matter of law, § 4-104 applies to all Commander positions. It is undisputed that Mr. Fonville was promoted from Captain to Commander, which was above the Captain and the Inspector positions both in rank and in pay. *See* Fonville Dep. at 60-61; *see also* Pl.'s Opp'n/Cross Mot. at Ex. 18. Section 4-104, with its provision authorizing the Chief to return high-ranking members of the force, including Commanders, to the rank of Captain without notice or cause, therefore applied to Plaintiff throughout his tenure with MPD. Accordingly, the District's motion for summary judgment on Count One of the Complaint is **GRANTED**, and Plaintiff's motion for summary judgment on Count One is **DENIED**.

### B. Plaintiff's Reputation-Plus Claim

The District also asks the Court to reconsider its 2006 decision denying the District's motion for summary judgment on the Plaintiff's liberty interest claim. *See* Def.'s Renewed Summ. J. Mot. 24-29 (ECF No. 119); Def.'s Reply at 1-2, 23-33 (ECF No. 126). In its previous order, the Court found that there were genuine issues of material fact in dispute. See *Fonville*, 448 F. Supp. 2d at 28-29. Upon further consideration, and having reviewed again the entire record in the case, the Court concludes that there are in fact no genuine issues of

material fact in dispute.  The Court will therefore grant the
District's motion for reconsideration and consider again its
motion for summary judgment.[5]

A claim for deprivation of a liberty interest without due
process based on allegedly defamatory statements of government
officials in connection with a demotion may proceed on one of
two theories: a "reputation-plus" claim or a "stigma or
disability" claim.  *See O'Donnell v. Barry*, 148 F.3d 1126, 1140
(D.C. Cir. 1998).  Plaintiff only proceeds on the reputation-
plus theory.  Pl.'s Opp'n/Cross Mot. at 27.  A reputation-plus
claim requires "the conjunction of official defamation and
adverse employment action . . . [including] a demotion in rank
and pay."  *O'Donnell*, 148 F.3d at 140.

Plaintiff claims that Chief Ramsey's statements to the
*Washington Post* and *Washington Times* regarding his demotion were
"defamatory," they "deprived Plaintiff the liberty to pursue his
chosen profession," and they resulted in "loss of income and
other employment benefits and damage to his professional
reputation."  Compl. ¶¶ 30-31.  The District makes two principal

_____

[5] Plaintiff argues that the Court should be bound by the law of
the case doctrine, and therefore should not revisit its 2006
determination regarding his liberty interest claim.  Pl.'s
Opp'n/Cross Mot. at 25-27 (ECF Nos. 122-23).  Based on the
precedent of this Circuit, however, "[i]nterlocutory orders are
not subject to the law of the case doctrine and may always be
reconsidered prior to final judgment."  *Langevine v. Dist. of
Columbia*, 106 F.3d 1018, 1023 (D.C. Cir. 1997).

arguments in its renewed summary judgment motion.  First, it
argues that Chief Ramsey's statements were not false and
therefore do not constitute defamation as a matter of law.
Second, the District argues that even if the statements were
sufficient to support a common law defamation claim, they did
not carry "the sort of opprobrium sufficient to constitute a
deprivation of liberty." *Harrison v. Bowen*, 815 F.2d 1505, 1518
(D.C. Cir. 1987); *see also* Def.'s Renewed Summ. J. Mot. at 26,
28, Def.'s Reply at 24-29.  The Court considered only the second
of these arguments in its 2006 memorandum opinion denying
summary judgment; it considers both now.

### 1. Plaintiff Does Not Show Chief Judge Ramsey's Statements Are False

To prevail on his defamation claim under District of
Columbia law, Mr. Fonville must show, first, that Chief Ramsey
made a false statement.  *Oparaugo v. Watts*, 884 A.2d 63, 76
(D.C. 2005).  "The burden of proving falsity rests squarely on
the plaintiff.  He or she must demonstrate either that the
statement is factual and untrue, or an opinion based implicitly
on facts that are untrue."  *Lane v. Random House*, 985 F. Supp.
141, 151 (D.D.C. 1995); *see also Rosen v. Am. Israel Pub.
Affairs Comm., Inc.*, 41 A.3d 1250, 1256 (D.C. 2012) ("statements
of opinion can be actionable if they imply a provably false
fact, or rely on stated facts that are provably false.")

(citations omitted).  "Truth is an absolute defense to [a]
defamation claim[], and a defendant may attack the falsity prong
of a plaintiff's claim by demonstrating the substantial truth of
the allegedly defamatory statement." *Edmond v. Am. Educ.
Servs.*, 823 F. Supp. 2d 28, 35 (D.D.C. 2011) (citations
omitted).  "'Substantially true' means that the 'gist' of the
statement is true or that the statement is substantially true,
as it would be understood by its intended audience." *Benic v.
Reuters Am., Inc.*, 357 F. Supp. 2d 216, 221 (D.D.C. 2004)
(citations omitted).  "In other words, literal truth is not
required, and a showing of the truth of the 'gist' or 'sting' of
the allegedly defamatory imputation is sufficient." *Jolevare v.
Alpha Kappa Alpha Sorority, Inc.*, 521 F. Supp. 2d 1, 13-14
(D.D.C. 2007) (quotation marks and citations omitted).

Chief Ramsey's statements at issue are that Plaintiff
engaged in "unacceptable behavior," which "was not consistent
with what [he] expected from a command member of [his] staff."
Pl.'s Opp'n/Cross Mot. Ex. 11.  Plaintiff claims that these
statements "were based on an incomplete picture of the facts or
an erroneous assessment of the facts."  Pl.'s Opp'n/Cross Mot.
at 30 (citing Ex. 11).  The crux of Plaintiff's argument is that
IAD did not find that his actions and conduct were "unbecoming
of an MPD officer," and therefore Chief Ramey's statement that
he engaged in unacceptable behavior implies a false assertion of

fact.  *Id.*  Plaintiff misstates Chief Ramsey.  The Chief did not

say that Plaintiff's conduct was unbecoming of a police officer;

he said his conduct during the incident was "unacceptable" and

"not consistent with what *I expect from a command member of my*

*staff.*"  Pl.'s Opp'n/Cross Mot. Ex. 11 (emphasis added).

Accordingly, Plaintiff must demonstrate that this statement of

opinion implies a provably false assertion of fact.  He has not

done so.

Mr. Fonville does not dispute that Chief Ramsey learned of

his conduct as a result of the IAD investigation, and relied on

it in making his determination to demote Plaintiff.  Def.'s SMF,

¶¶ 6, 8 (ECF. No. 119); Pl.'s SMF ¶ 12 (Doc. 123); Def.'s Suppl.

SMF ¶¶ 8, 10 (ECF. No. 126).  He does not dispute that the IAD

conducted a thorough investigation of the facts and

circumstances; indeed, Plaintiff relies on that report in

arguing that he should not have been demoted.  Pl.'s Opp'n/Cross

Mot. at 30-31.

The IAD report concludes that Plaintiff precipitated

contact with the FPS officer by parking illegally.  Pl.'s

Opp'n/Cross Mot. Ex. 8 (hereinafter "IAD Report").  The report

also concludes that Plaintiff failed to carry his service weapon

and badge in his possession while in the District, in violation

of the Municipal Regulations.  *Id.*  With respect to the incident

itself, the IAD report contains four statements from

eyewitnesses to the incident. It is highly significant that none of the witnesses were participants in the incident, nor were they officers of the MPD or the FPS, nor did they know either Mr. Fonville or the FPS officer involved. While the witnesses did not describe Plaintiff's behavior as criminal, each and every one made at least one negative comment regarding Plaintiff's conduct.

ATF Special Agent Chris Pelletiere stated that Plaintiff "would not comply with any of those instructions" issued by the FPS officer, and described Plaintiff's actions as "argumentative," and "belligerent." *Id.* at 4; *see also* IAD Report Attachments, Pl.'s Opp'n/Cross Mot. Ex. 14 (ECF. No. 122-14). ATF Special Agent Lewis Raden described Plaintiff's conduct as "resisting" and "not cooperating" with the FPS officer's commands. IAD Report at 4; *see also* IAD Report Attachments, Pl.'s Opp'n/Cross Mot. Ex. 15 (ECF No. 122-15). Retired ATF Special Agent Willie Ellison stated that Plaintiff's actions were "not what he would have deemed appropriate for a commander in the police department." *Id.* Finally, Special Police Officer John Robinson stated that after the initial interaction between Plaintiff and the FPS officer, he saw Plaintiff "attempt to pull away, and the FPS officer stop[ped] him by use of siren and lights . . . Commander Fonville exit[ed] his car very irate . . ." IAD Report at 5-6; *see also* IAD

Report Attachments, Pl.'s Opp'n/Cross Mot. at Ex. 15 (ECF No. 122-15).

In his deposition, Chief Ramsey testified that that these statements were the basis for his opinion concerning the Plaintiff's conduct:

Q: So the allegations of assault [that Plaintiff assaulted the FPS officer] were not a critical component in your decision to demote Mr. Fonville?

A: The allegation was just one part of the entire scenario that was being painted by the officer and the witnesses that were present that day.

Q: And my question to you is how did that figure into your decision to demote him? Did you consider that to be one of the critical parts or not?

[OBJECTIONS]

A: No.

Q: What was the most critical component in your mind of the incident that led you to demote him?

[OBJECTIONS]

A: The overall conduct and the way he dealt with the situation with the officer in a confrontational manner, which I thought was uncalled for.

Q: So, to you it wouldn't matter if [Plaintiff] was wrongfully stopped [by the FPS officer]?

[OBJECTIONS]

A: I believe the issue again of whether or not the stop was proper or whether or not the officer had the legal authority to issue a citation is secondary to the conduct displayed by Mr. Fonville at the time. I think he exercised poor judgment and poor self-control in the way in which he conducted himself in a situation like that . . . .

Q: Did you consider the fact that [IAD] did not find that he had engaged in conduct unbecoming?

A:    [IAD] was conducting an investigation into
allegations, specific allegations, of misconduct.  I certainly
read that report.  I was looking at not only that, but with the
overall conduct and behavior of a member of my Command staff and
found that I didn't want him serving any longer in that
capacity.

Ramsey Dep. 155-158 (ECF No. 127-4).

In sum, it is undisputed that Plaintiff was demoted after

Chief Ramsey determined his conduct during the incident was not

consistent with his expectations of a command member of his

staff.  As set forth in Section III.A above, Chief Ramsey had

complete discretion to demote Plaintiff in accordance with the

D.C. Code.  Plaintiff has failed to demonstrate that any of the

statements Chief Ramsey relied upon were verifiably false, or

that they did not support his conclusion that Mr. Fonville

exhibited behavior that was not consistent with his expectations

of his command staff.  Plaintiff's own uncorroborated testimony

about the incident, in which he denies behaving in a

confrontational manner or exhibiting poor judgment, is not

enough to create a genuine issue of fact, particularly in light

of the contrary testimony of all four eyewitnesses interviewed

by the IAD.  *See Bowyer v. Dist. of Columbia*, 910 F. Supp. 2d

173, 190 (D.D.C. 2012) (where non-moving parties rely almost

entirely upon their own uncorroborated statements at the summary

judgment stage, it may be "insufficient to establish a triable

issue of fact-at least where the nature of the purported factual

dispute reasonably suggests that corroborating evidence should be available.") (internal quotations omitted). Accordingly, Plaintiff has not raised a genuine issue of material fact as to the falsity element of his defamation claim and summary judgment is therefore appropriate. *See Jolevare*, 521 F. Supp. 2d at 14 (granting summary judgment for defendant on defamation claim where plaintiffs did not "raise[] a genuine issue of material fact as to the falsity of the organization's publication of their suspensions for engaging in what the sorority properly concluded amounted to hazing.").

### 2. Even if The Statements Were Defamatory, They Do Not Violate Plaintiff's Liberty Interests

Even assuming Chief Ramsey's statements were false and defamatory, Mr. Fonville's liberty interest claim cannot succeed because the statements do not carry "the sort of opprobrium sufficient to constitute a deprivation of liberty." *Harrison*, 815 F.2d at 1518. Summary judgment is therefore warranted for this additional reason.

In this Circuit, a reputation-plus claim cannot be based on defamation related to a plaintiff's job performance. Rather, to implicate constitutional interests under the reputation-plus theory, the government's defamation must "call into serious question those personal characteristics that are central or enduring in nature," such as "accusations of dishonesty, the

commission of a serious felony, manifest racism, serious mental illness, or a lack of intellectual ability." *Alexis v. Dist. of Columbia*, 44 F. Supp. 2d 331, 339 (D.D.C. 1999); *see also Mazaleski v. Truesdell*, 562 F.2d 701, 714 (D.C. Cir. 1977). In the 2006 opinion, the Court concluded that Chief Ramsey's statements suggest Plaintiff was "'inherently incapable' of performing his duties" and "were certainly capable of stigmatizing plaintiff," and denied the District's summary judgment motion on that basis. *Fonville*, 448 F. Supp. 2d at 29. Upon careful review of the caselaw, the Court concludes that reconsideration is warranted, and that the statements do not violate Plaintiff's constitutional rights.

Both this Circuit and the District of Columbia Court of Appeals have made plain that "not every governmental allegation of professional incompetence implicates a liberty interest . . . allegations [infringe constitutional interests] only when they denigrate the employee's competence as a professional and impugn the employee's professional reputation in such a fashion as to effectively put a significant roadblock in that employee's continued ability to practice his or her profession." *Leonard v. Dist. of Columbia*, 794 A.2d 618, 627-28 (D.C. 2002) (citation omitted); *see also Mazaleski*, 562 F.2d at 714 (explaining that although many allegations in connection with an adverse employment action "might well interfere with . . . opportunities

for subsequent employment," this does not mean they are "of such a serious and derogatory nature as to require due process protection.").

In *Mazaleski*, the Circuit court examined the difference between statements sufficient to infringe a plaintiff's liberty interest and statements that, although disparaging or insulting, do not. 562 F.2d at 714. The Circuit court concluded that statements indicating that an employee was terminated or demoted for dishonesty, for criminal conduct, for mental illness, and for lack of intellectual ability, as distinct from performance, did affect a plaintiff's liberty interest. *Id.; see also Leonard*, 794 A.2d at 628 (finding that a statement that employees lack the skills to perform the functions of their jobs implies an "inherent incapability" "carries more potential for future disqualification from employment than a statement that the individual performed a job poorly" and is therefore actionable). On the other hand, statements that an employee was demoted or fired for "disruptive conduct," "improper and substandard job performance," failure to meet minimum standards in professional relationships, "highly unethical" professional conduct, "unsatisfactory performance," and "deficiencies in . . . professional conduct," do not violate an employee's constitutional rights. *Mazaleski*, 562 F.2d at 714 (collecting cases).

More recently, in *Holman v. Williams*, the plaintiff was
fired from his position in the D.C. government.  An
administration official made a statement to the *Washington Post*
that Mr. Holman was terminated because of his "inability to get
along with staff . . .  The office was up in arms.  It was total
chaos."  *Holman,* 436 F. Supp. 2d 68, 72 (D.D.C. 2006).  The
Court granted the defendants' motion to dismiss plaintiff's
reputation-plus claim, finding that the statements "speak only
to plaintiff's job performance, rather than to any enduring
defect in [his] personality, character or intellect."  *Id.* at
79.

In the present case, Chief Ramsey's statements relate to
plaintiff's "unacceptable" behavior, during a single incident in
which he lost his temper and exercised poor judgment, which did
not meet Ramsey's expectations for his command staff.  These
statements are much like those found constitutionally
permissible in *Mazaleski*; they describe a lapse in professional
conduct, not an inherent personal trait.  The fact that
Plaintiff was off-duty during the incident is not dispositive in
this case.  As the District notes, there are laws that regulate
its police officers' conduct both on and off duty.  Def.'s
Renewed Summ. J. Mot. at 28, *see also, e.g.*, D.C. Mun. Regs.
tit. 6-A, § 206.1 (requiring MPD officers to have their service
weapons and badge in their possession while in the District of

Columbia); D.C. Mun. Regs. tit. 6-A, § 202.1 ("a member of the force shall at all times . . . maintain decorum and command of temper; be patient and discreet . . ."); *Dist. of Columbia v. Coleman*, 667 A.2d 811, 818 n.11 (D.C. 1995) ("members of the police force are 'held to be always on duty' [in the District] and are required to take police action when crimes are committed in their presence.") (citations omitted). In sum, Chief Ramsey's statements suggest a "situational rather than an intrinsic difficulty," and not "an inherent or at least a persistent personal condition, which both the general public and a potential future employer are likely to want to avoid." *Harrison*, 815 F.2d at 1518. They are therefore insufficient to constitute a deprivation of Plaintiff's liberty as a matter of law. *Mazaleski*, 562 F.2d at 714; *Leonard*, 794 A.2d at 627-28. Accordingly, for this additional reason, summary judgment on Count Two of the Complaint will be **GRANTED** for the defendant.

### C. Motion for Attorneys' Fees

"Under Rule 37, the district court has broad discretion to impose sanctions for discovery violations, and to determine what sanctions to impose." *Tequila Centinela S.A. de C.V. v. Bacardi & Co. Ltd.*, 248 F.R.D. 64, 68 (D.D.C. 2008). To determine the proper amount of an attorneys' fees award, the Court uses the lodestar method, multiplying a reasonable hourly rate by a reasonable number of hours expended. *Cobell v. Norton*, 231 F.

Supp. 2d 295, 300 (D.D.C. 2002). The burden is on the moving party to prove that the request is reasonable, and the Court has discretion to adjust the fee award in view of the opposing party's objections. *Tequila Centinela*, 248 F.R.D. at 68.

In this case, the District failed to produce documents, which the Court had ordered produced on July 25 2005, until January 30, 2008, *less than a month before trial was scheduled to begin.* Pl.'s Mot. in Limine (ECF No. 75). After a flurry of additional proceedings relating in significant part to this discovery violation, on April 7, 2008, the Court issued an order awarding sanctions "in the form of costs, expenses and attorneys' fees that reasonably flow from the defendant's noncompliance" with the Court's July 25, 2005 Order. Consistent with the April 2008 Order, Plaintiff submitted documentation supporting his fee request. Plaintiff requests $65,924.95 in fees and expenses related to seven categories of work: 1) review and analysis of the late-produced documents; 2) consultations between Plaintiff's two attorneys regarding the District's non-compliance; 3) drafting an initial motion for sanctions; 4) preparation for and attendance at four status hearings in the winter and spring of 2008; 5) drafting Court-requested recommendations and responding to the District's recommendations for further proceedings regarding scheduling issues in winter 2008; 6) briefing Plaintiff's renewed motion for sanctions; and

7) preparing the fee petition.  For the following reasons, the Court finds some of the fees requested to be excessive and beyond the scope of the Court's April 7, 2008 Order, and will reduce them accordingly.  The Court finds the remaining portions of fee request reasonable and well supported and will therefore award attorney's fees.

### 1. Reasonable Rates

Plaintiff's counsel request rates under the U.S. Attorney's Laffey rate for 2008 consistent with their years of experience: $390/hour for Ms. Deak's work and $440/hour for Mr. Williams' work.  The District does not challenge the reasonableness of these rates, and the Court finds they are reasonable under the law of this Circuit.  *See Covington v. Dist. of Columbia*, 57 F.3d 1101, 1114 n.5 (D.C. Cir. 1995) (opining that "use of the broad *Laffey* matrix may be by default the most accurate evidence of a reasonable hourly rate.").

### 2. Reasonable Hours

In support of the number of hours for which he seeks compensation, Plaintiff's two attorneys provide sworn declarations with attached time logs reflecting the number of hours expended on the seven tasks described above.  *See* Pl.'s Petition for Attorney Fees ("Fee Petition"), Ex. 1, Decl. of Leslie Deak ("Deak Decl."); Ex. A to Deak Decl; Ex. 2, Decl. of Ted Williams ("Williams Decl."), Ex. A to Williams Decl. (ECF

No. 93).  The time logs are based on contemporaneously recorded
time entries for each attorney, edited to reflect only the
activities counsel deemed pertinent to the 2008 Sanctions Order.[6]
Deak Decl. ¶ 17; Pl.'s Reply in Support of Petition, Second Deak
Decl. ¶¶ 1-8 (ECF No. 101).

The District objects to many of the time entries for a
variety of reasons.  First, it objects to the hours requested
for work related to the status hearings and the drafting of
recommendations to the court because neither the hearings nor
the recommendations solely related to the sanctions.  Def.'s
Opp'n to Fee Petition at 13-14. Defendant also argues that the
hours billed for legislative history research are not
compensable, because Ms. Deak would have to complete this
research regardless of the sanctions issue. *Id.* at 11.
Plaintiff concedes that the status hearings and written
recommendations to the court did not focus only on sanctions
issues, but argues, without citation, that the Court should
award fees for "those tasks that lie outside the direct line
flowing from Defendant's failure to comply [with the discovery

---

[6] The District questions whether Ms. Deak kept contemporaneous
records.  See Def.'s Opp'n to Fee Petition at 10 (ECF No. 98).
In light of Ms. Deak's sworn declarations that she kept such
records and detailing how she did so, and the standardized time
records she produced, the Court finds the records sufficient "to
permit the . . . Court to make an independent determination
whether the hours claimed are justified." *Nat'l Assn. of
Concerned Veterans v. Sec'y of Def.*, 675 F.2d 1319, 1327 (D.C.
Cir. 1982).

order] but still stay within a reasonable margin outside the direct line." Pl.'s Reply in Support of Fee Pet. at 8.

The Court agrees with Defendant. "As other courts in this district have noted, a near 'but for' relationship must exist between the Rule 37 violation and the activity for which fees and expenses are awarded." *Beck v. Test Masters Educational Services*, 289 F.R.D. 374, 385 (D.D.C. 2013) (internal quotations omitted); *see also Westmoreland v. CBS, Inc*., 770 F.2d 1168, 1179 (D.C. Cir. 1985) (requiring fees and expenses awarded to be "incurred because of" the sanctioned violation); *Cobell v. Babbitt*, 188 F.R.D. 122, 127 (D.D.C. 1999) (requiring a near 'but for' relationship where court ordered fees "caused by defendants' failure to obey" discovery orders). The language of the Court's April 7, 2008 order does not deviate from this standard. It permits Plaintiff to seek fees "that reasonably flow from the defendant's noncompliance," with the 2005 discovery order and states that Plaintiff should receive "fees incurred as a result of defendant's failure to comply" with that order. Pl.'s Reply in Support of Fee Pet. at 8; see also April 7, 2008 Order. Accordingly, Plaintiff must establish that the activity for which he seeks fees and expenses arose out of the Rule 37 violation that the Court sanctioned.

Plaintiff concedes that "the fee petitions were not the sole topic of discussion at status conferences." Fee Petition

at 7.  The status conferences concerned, *inter alia*, the
District's request to file a new dispositive motion, which
"arose for two stated reasons, *one of which* was to provide it a
chance to raise arguments about the late-produced documents."
*Id.* (emphasis added).  Likewise, Plaintiff concedes that the
time spent preparing his recommendations to the Court regarding
scheduling issues and his response to defendant's
recommendations arose "to give the parties an opportunity to
make arguments and proposals to the Court for the handling of
Defendant's request to file a new dispositive motion." *Id.* at
7-8.  Again, that request was based partially, but not entirely,
on the late-produced documents. *Id.*  Accordingly, because
Plaintiff has not established that these activities were solely,
or even primarily, focused on the sanctionable conduct, the
Court will deduct 25% of the time requested relating to the
status hearings and the recommendations.  This reduction amounts
to a deduction of 9.34 hours for Ms. Deak and 5.875 hours for
Mr. Williams.  Finally, Plaintiff does not respond to
defendant's argument that the Court should deduct time Ms. Deak
spent researching legislative history because this research was
necessary "regardless of any sanctions related issue."  Opp'n to
Fee Petition at 11.  The Court finds Plaintiff has not
demonstrated a fee award for legislative history research is
reasonable, and will therefore deduct 5.5 hours Ms. Deak

34

expended on that task.  For the same reasons, the Court will deduct 1.75 hours of Mr. Williams' time conducting research for Plaintiff's yet-to-be-filed dispositive motion on April 27, 2008.

Next, the District objects to Plaintiff's request for fees for the time spent requesting a fee award against the District's counsel under 28 U.S.C. § 1927, because Plaintiff did not prevail on this request.  Plaintiff argues – without citation – that "prevailing on an issue is not the standard.  The section of Plaintiff's brief in the Motion for Sanctions still reasonably flowed from Defendant's failure to comply with the 2005 discovery order and, hence, is compensable."  Pl.'s Reply at 11.  Plaintiff's position is not persuasive.  "Attorney's fees are not recoverable for time [spent] on issues on which the party seeking the fees did not ultimately prevail."  *Tequila Centinela*, 248 F.R.D. at 71 (citations omitted).  In this matter, the single issue that was decided adversely to the District was its non-compliance with the July 2005 discovery Order.  The Court rejected Plaintiff's claims that the District's counsel should be separately sanctioned for vexatiously multiplying the proceedings.  Plaintiff spent approximately one-fifth of his second sanctions brief and reply on this unsuccessful argument.  Accordingly, the Court will

deduct that amount from Plaintiff's fee request.  This reduction
amounts to a deduction of 8.464 hours for Ms. Deak.

Defendant's remaining arguments consist mainly of
generalized claims that the billing entries are vague, the
attorneys engaged in impermissible block billing, and the hours
spent are duplicative and excessive.  *See generally* Def.'s Opp'n
to Petition.  For example, Defendant claims that all of the
requested fees should be reduced by 50% due to impermissible
block billing, see *id.* at 8, and claims, without support, that
Ms. Deak should have drafted Plaintiff's reply in support of
sanctions in "no more than 5 billable hours."  *Id.* at 20.
Defendant also claims that the Plaintiff should not recover fees
for drafting the second sanctions motion because it was
"duplicative of the time spent to draft the first motion."  *Id.*
at 11.  None of these arguments are persuasive.

Block billing refers to a single time entry that lists
multiple tasks, thus making it impossible to evaluate each
task's reasonableness.  *See Role Models Am., Inc. v. Brownlee*,
353 F.3d 962, 971 (D.C. Cir. 2004).  The Court is satisfied with
the level of detail provided in the entries, and finds that,
with the exception of the specific reductions explained herein,
the Plaintiff's attorneys expended a reasonable amount of time
in this matter.  Accordingly, no reductions will be made based
on alleged "block billing."

Defendant's argument that Plaintiff should not recover fees for drafting the second motion for sanctions is also without merit. A cursory comparison of the two motions reveals that, although there is some minor overlap between the two, the Plaintiff's second motion is much more thorough and more detailed than the first, and also asserts, for the first time, several additional bases for sanctions. *See* Reply in Support of Fee Pet. at 24; *compare* Doc. No. 75 (nine page motion in limine to exclude newly produced documents from trial) *with* Doc. No. 82 (thirty two page motion for sanctions pursuant to Fed. R. Civ P. 37, 16, and 28 U.S.C. § 1927). Likewise, the bare, unsupported argument that Plaintiff should have taken five hours to draft reply is without merit. Plaintiff's reply was thorough and substantive; and although his attorneys may have spent more time on the reply than others would choose, "[t]he question for the Court, however, is not whether the expense was necessary but whether it was reasonable." *Beck*, 289 F.R.D. at 385. Given the District's failure to provide the discovery to which Plaintiff was entitled, and its failure to provide discovery specifically ordered by the Court in its July 25, 2005 Order until less than four weeks before trial, Plaintiff reasonably expended a number of hours obtaining relief to which he was entitled.

Making the above noted reductions, the Court will award Plaintiff $ 41,580.24 in fees for Ms. Deak's work and

$ 11,899.80 in fees for Mr. Williams' work which reasonably flowed from the District's non-compliance with this Court's Order of July 25, 2005.  The District shall pay Plaintiff's attorneys fees of $53,480.04.

**IV.  CONCLUSION**

For the foregoing reasons, it is hereby ordered that the defendant's renewed motion for summary judgment is **GRANTED**, and it is further ordered that Plaintiff's renewed cross motion for partial summary judgment is **DENIED.**  It is further ordered that, in accordance with the Court's Minute Order of March 23, 2009, the Plaintiff is hereby awarded attorneys' fees of $53,480.04. An appropriate order accompanies this memorandum opinion.


**SIGNED:    Emmet G. Sullivan**
            **United States District Judge**
            **April 14, 2014**